UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| JANICE MESSNER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No.  1:12CV48 TIA |
| | ) |
| CAROLYN W. COLVIN,[1] | ) |
| ACTING COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court under 42 U.S.C. § 405(g) and for judicial review of the denial of Plaintiff's application for Disability Insurance Benefits under Title II of the Social Security Act.  The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

**I.  Procedural History**

On October 31, 2008, Plaintiff filed an application for Disability Insurance Benefits ("DIB"), alleging disability beginning June 1, 2005 due to chronic pain in both arms and hands, chronic depression, inner ear problems, chronic fatigue, panic attacks, cluster headaches, GERD, allergies, sleep apnea, memory loss, carpal tunnel, arthritis, and seizures.  (Tr. 131-34, 87) Plaintiff's application was denied on January 21, 2009, after which Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 84-92)  On July 14, 2010, Plaintiff appeared and testified at a hearing before an ALJ.  (Tr. 32-83)  In a decision dated August 9, 2010, the ALJ

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant in this action.

determined that Plaintiff was not under a disability at any time from June 1, 2005, the alleged onset date, through September 30, 2007, the date last insured. (Tr. 10-16) On January 25, 2012, the Appeals Council denied Plaintiff's Request for Review. (Tr. 1-3) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  Evidence Before the ALJ

On July 14, 2010, Plaintiff appeared at a hearing before an ALJ and was represented by counsel. Upon questioning by the ALJ, Plaintiff testified that she used a cane to keep her from falling due to dizziness. Plaintiff recently moved to the town of Doniphan, Missouri, after living in the country outside of town. She previously lived next to her parents, and both houses sat on 12 acres of land consisting of 3 ½ acres of yard. Plaintiff stopped caring for the yard in 2005. She quit working in 2002 to move to Florida and care for her father-in-law after he suffered a stroke. Plaintiff returned to Missouri in 2004 and unsuccessfully tried to work part time. She also continued to take care of her father-in-law until his death in March of 2005. Plaintiff helped him get out of bed, and she took him to doctor appointments. She also helped him up and down stairs with the aid of a belt. (Tr. 38-46)

Plaintiff further testified that she was able to do laundry. Her husband built a laundry chute, and Plaintiff had two washers and dryers. She made one trip downstairs to do a couple of loads and another trip to fold. Her husband then carried the folded laundry upstairs. Plaintiff stated that she completed two years of college and earned her associates degree in marketing management. The ALJ noted that Plaintiff had the experience, education, and training to perform sedentary work. Plaintiff indicated that she previously worked as an executive secretary at a junior college. She started working in the registrar's office and worked her way to executive

secretary to one of the vice presidents.  Plaintiff opined that, at present, she could possibly sit at a computer and type for about 30 minutes at a time.  At home, she had to sit on a pillow to use her laptop.   In addition, she stated that her memory was shot and that she had been tested for Alzheimers.  Doctors thought her memory loss could stem from medication side effects.  Her side effects included dizziness, diarrhea, memory loss, and fatigue.  Plaintiff still drove, but only when absolutely necessary.  Plaintiff testified that she was unable to perform her past work mentally and physically.  She had tennis elbow releases in both elbows, which provided some relief.  On a good day, Plaintiff could perform about 30 minutes of work before needing to take a break.  (Tr. 46-51)

     Plaintiff stated that she last gardened in the summer of 2004 or 2005.  She used to do a lot of canning, which caused her elbow problems.  Plaintiff also started having problems with her head in the fall of 2005.  She purchased a home close to the hospital in 2009.  In January of that year, she was able to walk around the park for about one mile.  Once she moved, Plaintiff did daily exercises and walked around her house and up and down stairs.  She would stretch for about five minutes before getting out of bed.  The CPAP machine caused neck stiffness and headaches, causing her to take some time getting started in the morning.  Plaintiff went grocery shopping on Sundays after work.  During the week, she would pick up milk or juice.  Her husband unloaded the van.  Plaintiff handled the finances until about a year after her father-in-law passed away.  She testified that stress and depression caused her brain not to function.  Plaintiff's attorney noted that Dr. Stephen Jordan, a neuro-psychologist, concluded that Plaintiff had a combination of depression, fibromyalgia, and obstructive sleep apnea, which caused some

memory problems, typically with recall.  Plaintiff stated, however, that she did not realize she was depressed and merely thought she was exhausted and tired.  (Tr. 51-58)

Plaintiff's attorney followed up with some questions. Plaintiff stated that she saw Dr. Burns to help keep her fibromyalgia under control.  She first saw Dr. Burns in December, 2008; however, her symptoms began as early as 2000 when she was attacked by a Rottweiler in both arms and both legs.  She presently experienced stabbing pain in those areas, which she described as a constant, nagging pain.  The pain had been bad for the past four or five years and was primarily in her forearms and left shin.  Activities such as lifting something heavy or performing repetitive activity such as typing on the computer, peeling potatoes, or folding laundry aggravated the pain in her forearms.  Plaintiff needed to take a break after 30 minutes.  She would sit in the recliner with her foot propped up and apply heat to her arms, shins, and ankles.  (Tr. 58-61)

The ALJ next asked Plaintiff about her medications, which included Vicodin for pain twice daily.  She began taking pain medication in July of 2007.  Hydrocodone worked best, but it caused her memory to become foggy and made her sleepy.  (Tr. 61-63)

Upon further questioning by her attorney, Plaintiff stated that her husband did all the driving since the middle of 2005.  Plaintiff's problems with driving included severe pain in her arms and legs, as well as an inability to stop in time, requiring her to slam her brakes at the last minute.  Plaintiff only drove when necessary, and the next day her arms hurt terribly.  In addition, she could not focus or remember while driving.  (Tr. 63-64)

Plaintiff informed the ALJ that her husband took her elderly parents to their doctors' appointments.  Her sisters helped out as well.  Plaintiff talked to her mother two or three times a

day to make sure she's okay.  Plaintiff also went to her parents house once a month to pay their bills.  Her parents' house was four blocks from Plaintiff's house.  (Tr. 64-65)

As for her daily activities, Plaintiff stated that over the past three years, she had to keep her hair short because she was unable to curl or blow dry her hair.  In addition, her husband did 95% of the cooking.  Plaintiff only cooked with a crock pot because she forgot she was cooking and burned things.  Plaintiff decided to file for disability after she and her husband went to the Social Security office to check on his retirement.  A worker in the office encouraged Plaintiff to file after seeing bandages on Plaintiff's arms and questioning her about her impairments.  Plaintiff's ability to perform household chores had also changed over the past three years.  She could only do a little bit each day, such as shopping one day and doing laundry the next.  Her husband vacuumed.  Plaintiff used to help with the children in church and decorate cakes for family events.  She also previously enjoyed scrap booking.  Friends from California visited a couple times a year.  If she went out in the heat, she wrapped a towel drenched in ice water around her shoulders.  When the weather was cooler, her joints become stiffer.  She no longer gardened or water skied.  (Tr. 65-71)

A vocational expert ("VE"), Susan Shea, also testified at the hearing.  The ALJ noted that Plaintiff was a younger individual on the date last insured.  The VE listed Plaintiff's vocational history as an advertising/marketing manager, which was sedentary and skilled as generally performed and heavy as she performed it; executive secretary, which was skilled and sedentary as generally performed and light as Plaintiff performed it; and training coordinator, which was light and skilled as generally performed but medium per Plaintiff's testimony.  (Tr. 72-75)

The ALJ then asked the VE to assume a hypothetical individual that was younger with two years of college plus the past work experience previously mentioned.  Further, the individual could perform the full range of light work except that she could never climb ladders, ropes, or scaffolds.  Given this hypothetical, the VE testified that the individual could perform all of Plaintiff's past relevant work as defined by the Dictionary of Occupational Titles ("DOT").  (Tr. 75-77)

For the second hypothetical, the VE was to assume a younger person with two years of college and Plaintiff's past work experience.  She was limited to sedentary work and could never use ladders, ropes, or scaffolds.  In light of this hypothetical, the individual could perform the jobs of marketing manager and executive secretary as defined by the DOT.  If the ALJ added the need for a low stress job with only occasional decision-making or occasional changes in the work setting, Plaintiff's past relevant work would be eliminated.  However, there would be other sedentary, unskilled jobs which the individual could perform such as hand assembler worker, charge account clerk, and telephone information clerk.  (Tr. 77-79)

If the ALJ added the limitations of only occasional fine and gross manipulations due to pain issues and only occasional work with hands because of pain in her hands and elbows, those jobs would be eliminated.  No other jobs would be available.  (Tr. 79-80)

Last, the ALJ asked the Plaintiff when she began wearing a CPAP.  Plaintiff stated that she began in 2001 but stopped in 2002 when she moved to Florida, where she was less stressed.  She resumed wearing it every night in early January 2009.  She slept well if she took a pain pill in conjunction with using the CPAP.  (Tr. 80-83)

### III.  Medical Evidence

On December 13, 2004, Plaintiff complained of left elbow pain and left hip pain. M.B. Moore, M.D., noted tenderness over her wrist and hip.  However, Plaintiff had good flexion and normal range of motion in her hip, and elbow and hip x-rays were normal.  Dr. Moore assessed bursitis.  (Tr. 205) On March 7, 2005, Plaintiff complained of pain in both elbows.  Dr. Moore did not believe surgery was warranted but referred her for a second opinion with Dr. Schaeffer.  (Tr. 203)

Plaintiff began treatment with Brian C. Schafer, M.D., on March 22, 2005.  Plaintiff complained of left elbow pain.  Dr. Schafer assessed left lateral epicondylitis, for which he administered an injection.  Plaintiff returned for another injection in her left elbow on July 10, 2005.  (Tr. 253-55)

On August 9, 2005, x-rays of Plaintiff's lumbar spine indicated early degenerative changes.  An MRI of her lumbar spine showed no significant bulging or herniated disc but demonstrated early degenerative arthritis.  (Tr. 228-29)

On March 21, 2006, Plaintiff complained of left elbow pain and left shoulder pain.  X-rays of the shoulder showed a type II acromion but no other bony abnormalities.  Dr. Schafer diagnosed left shoulder rotator cuff tendonitis, administered an injection, and scheduled shoulder MRI.  (Tr. 256)  Dr. Schafer noted on April 4, 2006 that the MRI showed left shoulder rotator cuff tendonitis with impingement syndrome.  (Tr. 259)  On May 2, 2006, Plaintiff's left shoulder was significantly improved, but she complained of pain in both elbows.  Dr. Schafer assessed bilateral tennis elbow.  (Tr. 261)

X-rays of the thoracic spine conducted on July 10, 2006 denoted mild degenerative arthritis and mild scoliosis, and x-rays of the cervical spine showed mild degenerative arthritis. (Tr. 226-27)

Plaintiff continued to complain of pain in both elbows, for which Dr. Schafer administered injections. On June 28, 2007, Plaintiff agreed to undergo left tennis elbow release, which was performed on July 9, 2007. Dr. Schafer noted that Plaintiff was doing well status-post left tennis elbow release on July 12, 2007. One week later, Plaintiff's wounds looked good. Dr. Schafer reminded her not to do any kind of lifting or strong grip. Her symptoms were improving on August 16, 2007, and she had full range of motion. (Tr. 262-71)

On September 13, 2007, Plaintiff complained of right elbow pain and hip pain. Dr. Schafer assessed right tennis elbow and right trochanteric bursitis. He administered an injection to Plaintiff's right hip and scheduled her for right tennis elbow release surgery. Plaintiff underwent surgery on January 7, 2008. During a follow up visit in January 24, 2008, Plaintiff reported some symptoms, which Dr. Schafer believed could be due to the weather. Plaintiff was doing very well on February and March of 2008, with full range of motion and strength. (Tr. 272-74, 451-57)

Plaintiff returned to Dr. Schafer on October 16, 2008, complaining of pain over the area of her radial tunnels bilaterally, as well as pain over her left ankle. Dr. Schafer assessed bilateral radial tunnel syndrome and paroneal tendonitis. When Plaintiff returned on November 13, 2008, Dr. Schafer opined that Plaintiff's diffuse bilateral upper extremity pain sounded like fibromyalgia or some more systematic problems. He recommended that Plaintiff see Dr. Burns or Dr. Bowen for further evaluation and treatment. (Tr. 458-59)

Plaintiff began treatment with Bernard C. Burns, D.O., on December 2, 2008. Dr. Burns noted full range of motion and normal strength in the upper and lower extremities. However, tender points were positive 18 of 18 in a full body survey. He diagnosed presumed fibromyalgia; multiple medical problems, chronic and recurring tendonitis; some degenerative joint disease; and obstructive sleep apnea, untreated. (Tr. 461-63) When Plaintiff returned to Dr. Burns on January 9, 2009, physical exam revealed full range of motion in upper and lower extremities and normal strength and reflex. She had 9 of 9 positive tender points in a right sided survey. Dr. Burns assessed fibromyalgia; TMJ dysfunction; history of chronic tendonitis; and obstructive sleep apnea. Dr. Burns discussed treatment including sleep stabilization and adding regular exercise such as yoga. (Tr. 466-67)

During subsequent appointments with Dr. Burns, Plaintiff continued to display positive tender points upon examination. She also complained of bilateral ankle pain. (Tr. 668-81) On December 4, 2009, Dr. Burns noted that diffuse myofascial tenderness, positive pin points at 18 of 18 points, guarded cervical and lumbar spinal motion to about 70% of normal. He assessed fairly typical pain augmentation chronic pain syndrome compatible with a fibromyalgia syndrome. (Tr. 480-81)

On January 13, 2010, Plaintiff underwent a psychological evaluation. Georgette Johnson, Psy. D., noted Plaintiff's history of depression and anxiety. Dr. Johnson diagnosed major depressive disorder, severe without psychotic features; generalized anxiety disorder with symptoms of panic and phobic reactions; rule out panic disorder with agoraphobia; rule out neurological dysfunction; reported history of chronic pain, arthritis, fibromyalgia, degenerative spine, carpal tunnel syndrome, migraines, and sleep apnea; problems related to chronic pain

9

symptoms and decline in physical health; and a global assessment functioning ("GAF") of 44.  Dr. Johnson recommended that Plaintiff meet with a psychiatrist for symptom management and medication treatment, as well as meet with a psychological counselor for emotional support and stress management.  (Tr. 482-88)

Dr. Burns completed a Treating Medical Source Statement on December 17, 2009.  According to an Affidavit, the statement was submitted with the medical evidence but was not included in the exhibits before the ALJ.  In the statement, Dr. Burns opined that Plaintiff met the American Rheumatological criteria for fibromyalgia, as she had diffuse tender points.  Her prognosis was fair to good, with continued limitations.  Her symptoms included multiple tender points, non-restorative sleep, chronic fatigue, anxiety, frequent and severe headaches, numbness and tingling, subjective swelling, depression, and night sweats.  Factor precipitating the pain included changing weather, cold, fatigue, hormonal changes, movement/overuse, static position, and stress.  In addition, Dr. Burns stated that emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations.  He also reported that her physical and emotional impairments were reasonably consistent with the symptoms and functional limitations Dr. Burns described in his evaluation.  Her pain was frequently severe enough to interfere with attention and concentration, and Dr. Burns believed plaintiff had marked limitations in her ability to deal with work stress.  Medication side effects included memory loss, dizziness, anxiety, depression, loss of balance, drowsiness, fatigue, and difficulty concentrating.

In addition, Dr. Burns stated that Plaintiff's physical impairments, as they existed on or before September 30, 2007, limited her ability to perform physical activities required by a job.  These limitations included sitting for no more than 2 hours; standing for no more than 2 hours;

walking less than 2 hours; and lifting/carrying less than 10 pounds.  Further, she could never climb stairs, ladders, or scaffolds; never work around moving machine; never drive machine; never work at temperature extremes; occasionally be exposed to vibrations; occasionally balance; and never be exposed to fumes/odors/dusts/gases/poor ventilation.  Dr. Burns also opined that Plaintiff had significant limitations in her ability to reach, handle, or finger as a result of her impairments as they existed on or before September 30, 2007.  Plaintiff could use her hands to grasp or twist objects bilaterally 5% of the time during a work day; could use fingers for fine manipulation 20% of the day; and use arms to reach 5% of the day.  Dr. Burns stated that Plaintiff was unable to sustain a 40 hour work week on or around September 30, 2007 and that she needed a job which permitted shifting positions at will and allowed her to take unscheduled breaks for about 20 to 30 minutes frequently throughout the day.  Additionally, she would likely be absent from work more than three times in a month.  Finally, Dr. Burns indicated that the symptoms and limitations dated back to September 30, 2007.  (Social Security Brief Affidavit, ECF No. 11-1)

## IV.  The ALJ's Determination

In a decision dated August 9, 2010, the ALJ found that the Plaintiff last met the insured status requirements of the Social Security Act on September 30, 2007 and had not engaged in substantial gainful activity during the period from her alleged onset dat of June 1, 2005 through the date last insured.  Through September 30, 2007, Plaintiff had the following severe impairments: bilateral tennis elbow; arthritis; and rotator cuff tendonitis with impingement syndrome.  The ALJ further found that through the date last insured, Plaintiff did not have an

impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 10-12)

After considering the record, the ALJ determined that, through September 30, 2007, Plaintiff had the residual functional capacity ("RFC") to perform the full range of sedentary work, except for only occasionally balancing, bending, climbing, crawling, crouching, kneeling, and stooping. In addition, Plaintiff could never climb ladders, ropes, or scaffolds. The ALJ assessed the medical evidence before and immediately after Plaintiff's date last insured. The ALJ noted that no doctor had given a definitive diagnosis or placed any work-related physical or mental restrictions on Plaintiff. In addition, the ALJ found Plaintiff's depression and anxiety to be non-severe, as she was never treated for a mental disorder and stopped taking her prescription medications. The ALJ determined that Plaintiff was capable of performing past relevant work as an advertising/marketing manager and executive secretary. Thus, the ALJ concluded that Plaintiff was not under a disability at any time from June 1, 2005 through September 30, 2007, the date last insured. (Tr. 13-16)

## V.  Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process.  See 20 C.F.R. § 404.1520(b)-(f).  Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination of impairments which significantly limits her physical or mental ability to do basic work activities; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work.  Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g).  "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'"  Cruse v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)).  The Court does not re-weigh the evidence or review the record de novo.  Id. at 1328 (citing Robert v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)).  Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence.  Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required

which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[2] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak, 49 F.3d at 1354.

---

[2]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

## VI.  Discussion

In her Brief in Support of the Complaint, Plaintiff argues that substantial evidence does not support the ALJ's decision because the ALJ failed to consider the diagnosis of fibromyalgia and Dr. Burns' Medical Source Statement ("MSS").  Defendant, on the other hand, contends that the additional evidence attached to Plaintiff's brief does not require remand.  The undersigned disagrees and finds that the case should be remanded to allow the ALJ to review the MSS from Dr. Burns.

Defendant acknowledges that Plaintiff submitted the statement from Dr. Burns via electronic record express to be added to the case file before the administrative hearing and that the statement was not made part of the administrative record.  However, Defendant argues that the new evidence is not persuasive because he did not treat Plaintiff until after the date last insured.  Thus, Defendant contends that the medical evidence does not relate back to the period at issue and does not constitute a basis for reversal.

In this case, the statement from Dr. Burns should have been part of the administrative record, as it was submitted before the hearing.  Neither the ALJ nor the Appeals Council had the opportunity to weigh Dr. Burns' opinion, which, according to Dr. Burns, is applicable to the time period Plaintiff was insured.  Thus, the opinion is not properly part of the record.  See Goodridge v. Astrue, No. 4:11CV210 CDP, 2012 WL 234654, at *10 (E.D. Mo. Jan. 25, 2012) (stating newly submitted evidence is part of the record where it was presented to the Appeals Counsel).

With regard to medical source opinions, Social Security Ruling 96-5p provides:

> our rules provide that adjudicators must always carefully consider
> medical source opinions about any issue, including opinions about
> issues that are reserved for the Commissioner.  For treating

15

> sources, the rules also require that we make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us.
>
> . . .
>
> The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination of decision of disability, including opinions from medical sources about issues reserved to the Commissioner. If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record.

SSR 96-5p, 1996 WL 374183, at *2-*3 (July 2, 1996).

In this case, the ALJ did not have the opportunity in the first instance to assess or weigh Dr. Burns' statement, despite the fact that the evidence had been submitted. The parties agree that Plaintiff has shown good cause for the omission of new evidence. However, Defendant argues that the evidence is not material because Dr. Burns did not start treating Plaintiff until nearly a year after her insured status expired. New evidence is material where it is non-cumulative, relevant, and probative of the plaintiff's condition during the time period for which the Commissioner denied disability benefits. Hepp v. Astrue, 511 F.3d 798, 808 (8th Cir. 2008) (citation omitted). A medical source statement that is consistent with treatment notes during the relevant time period may relate back to a plaintiff's disability status on the date last insured. See Tilley v. Astrue, 580 F.3d 675, 680-81 (8th Cir. 2009) (crediting the treating physician's opinion and medical source statement where they were entirely consistent with treatment notes from the relative time). The Court finds that the statement from Dr. Burns may be relevant and probative of her condition prior to September 30, 2007.

Here, Dr. Burns opined that the symptoms and diagnosis related back to the date last insured. Initial review of the medical evidence demonstrates that Dr. Schafer, who practiced in the same group as Dr. Burns, treated Plaintiff for ongoing pain in her upper extremities. The ALJ should have the opportunity to determine whether Dr. Burns' medical statement is consistent with treatment notes during the relevant time period, and, if not, explain the inconsistencies between the evidence and the amount of weight entitled to Dr. Burns' opinion. See Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007) (citation omitted) ("When an ALJ discounts a treating physician's opinion, the Commissioner should give 'good reasons' for doing so."); SSR 96-2p, 1996 WL 374188 (July 2, 1996) ("Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques."); 20 C.F.R. § 404.1527(c)(2) (stating the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given] your treating source's opinion.").

Because the evidence was timely submitted but inadvertently omitted from the record before both the ALJ and the Appeals Council, the Court finds that the ALJ should review Dr. Burns' statement and its relevance to Plaintiff's claim of disability prior to September 30, 2007. The Court will therefore remand the case to the ALJ for review of Dr. Burns' medical statement and to re-contact Dr. Burns for additional information should the ALJ find this necessary.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **REVERSED** and **REMANDED** to the Commissioner for further

proceedings consistent with this Memorandum and Order. A separate Judgment in accordance with this Memorandum and Order is entered this same date.

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this 30th day of September, 2013.